The ST. PAUL INSURANCE COMPANY, Appellant,

v.

Sudeep S. RAKKAR, M.D., Appellee.

No. 05–91–00369–CV.

Court of Appeals of Texas, Dallas.

July 6, 1992.

Rehearing Denied Aug. 14, 1992.

Phillip W. Gilbert, Tony Nicholas, Jr., Dallas, J. Hampton Skelton, Austin, for appellant.

David K. Wilson, Roger D. Sanders, Sherman, for appellee.

Before LAGARDE, KINKEADE and WIGGINS, JJ.

## OPINION

LAGARDE, Justice.

The St. Paul Insurance Company appeals the $247,938 judgment rendered against it in favor of Sudeep S. Rakkar following a jury trial. St. Paul brings nineteen points of error on appeal generally contending that the trial court erred in: (a) awarding extra-contractual damages; (b) trebling the extra-contractual damages; (c) awarding breach-of-contract damages; (d) trebling the breach-of-contract damages; (e) awarding prejudgment interest at the rate of ten percent instead of six percent; and (f) trebling the prejudgment interest. We sustain the ninth and twelfth points contending that there is no evidence to support the jury's finding that St. Paul acted knowing-

ly. We also sustain the eighteenth point contending that the prejudgment interest rate for the $60,000 contract damages should be six percent. Accordingly, we reverse the trial court's judgment awarding treble damages and render judgment, on the jury's verdict, on Rakkar's common-law cause of action. We further modify the judgment to provide a six-percent prejudgment interest rate for the $60,000 contract damages.

### FACTUAL BACKGROUND

Rakkar owned a house in Jewett, Texas. On August 27, 1988, after the tenants who had been living in the house vacated the property, Rakkar travelled the four hours from his home in Whitesboro, Texas, to Jewett to inspect the property with the real estate agent who helped him manage the property. Rakkar planned to grill some hot dogs for his dinner, spend the night in the house, and return to Whitesboro the next day. With this plan in mind, Rakkar bought hot dogs, a small hibachi-type grill, lighter fluid, and obtained some charcoal. He also bought a bottle of drinking water because the water at the house had been shut off. When he got to the house, he opened the windows to air out the house and started the air conditioner. Because the grass around the house was tall and dry, he decided to light the grill in the kitchen and then carry it onto the patio after clearing a space for the grill on the patio. Rakkar set the grill on the kitchen floor. After lighting the grill, he had begun to work on the ceiling fan when his real estate agent arrived. She told Rakkar that she smelled something "hot," and Rakkar showed her the hibachi grill sitting on the kitchen floor. She told him that he should move it outside because the heat from the grill could burn the linoleum flooring. After declining Rakkar's invitation to join him for a hot dog, the real estate agent left. Rakkar decided to take the grill onto the patio. When he bent over the coals, he passed out. When he awoke five or six minutes later, the grill was overturned near the base of the cabinets, the coals were scattered over the kitchen floor, and the cabinets were on fire. Rakkar ran to the sink, but no water came out.

Rakkar then ran to his neighbors to get assistance, but they were not at home. He then drove the half mile to the marina and called the fire department, which was fifteen to twenty miles away. By the time the fire truck arrived, the house was completely engulfed in flames. The house burned to the ground.

The next day, Rakkar telephoned his insurance agent and reported the loss. On September 1, Rakkar met with Mike Williams, a special investigator with St. Paul. Williams questioned Rakkar about the fire and the surrounding circumstances and asked Rakkar to send him a written statement concerning how the fire occurred. Rakkar did so, and Williams received the statement on September 9. Williams also promised to send Rakkar a proof-of-loss form within two weeks. When Rakkar had not received the proof-of-loss form for nearly one-and-a-half months, he wrote Williams asking why St. Paul had not sent the form and when it was going to send one. Only then did St. Paul send Rakkar the proof-of-loss form, which he completed and returned to St. Paul by November 9.

After receiving Rakkar's sworn proof-of-loss form, St. Paul told Rakkar that it would notify him by January 15 of its decision whether to pay or deny the claim. St. Paul, however, waited until January 23 to tell Rakkar that it was denying the claim because:

> the facts of the loss, the results of St. Paul's good faith investigation, and [Rakkar's] own sworn testimony overwhelmingly indicate that the claim is the result of an intentionally set, incendiary fire, and that all facts point to no other reasonable conclusion but that either ... Rakkar, or an individual acting at his direction, both set the fire and precipitated its spread by use of flammable liquids throughout the structure.

St. Paul promised to pay off the mortgagee of the property. Because St. Paul did not pay off the mortgagee immediately, Rakkar continued to pay his monthly mortgage payments. When St. Paul had not paid the mortgagee by April 19, almost four months after St. Paul had told Rakkar that it

would pay the mortgage, Rakkar paid off the $40,000 mortgage himself and took an assignment from the mortgage company of its rights to the insurance payment from St. Paul. Although St. Paul requested a pay-off quote from the mortgagee on February 16, which was returned to St. Paul on February 28, and St. Paul wrote a check to the mortgagee for the full amount on March 10, St. Paul's attorney failed to send the check to the mortgagee until after Rakkar had paid the mortgage.[1] The mortgagee returned the check, uncashed, to St. Paul. When St. Paul learned that Rakkar had an assignment from the mortgagee for the insurance proceeds, St. Paul still refused to pay Rakkar.

## INSURER'S RELIANCE ON OPINIONS OF ARSON INVESTIGATORS

In the first three points of error, St. Paul contends that its reliance on its arson investigators in denying the fire-loss claim immunized it from extra-contractual liability as a matter of law and that there was no evidence showing that it did not rely on the investigators.

▬ In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, which support the jury's finding, and we must disregard all evidence and inferences to the contrary. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Stafford,* 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983); *Seideneck v. Cal Bayreuther Associates,* 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence.

*Kindred,* 650 S.W.2d at 63. Alternatively, in addressing a matter-of-law question, the reviewing court examines the record for evidence that supports the finding while disregarding all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the finding, the reviewing court examines the entire record to determine whether the proposition contrary to the finding has been conclusively established. *Id.*

▬ As St. Paul notes in its brief, an insurer's reliance on its investigator must be reasonable. *Aranda v. Insurance Co. of N. Am.,* 748 S.W.2d 210, 213 (Tex.1988). In this case, however, the evidence raises fact questions concerning both the reasonableness of St. Paul's reliance on its investigators and whether St. Paul actually relied on those investigations. Tom West, the fire investigator, concluded that the fire was intentionally set with flammable liquids. West based his conclusion on an examination of the spalling patterns in the concrete foundation, on the presence of hydrocarbon rings on the foundation, on the fire chief's narration of his interview with Rakkar, and on the findings of Dr. Armstrong, the chemist who examined the samples West took from the house. At the end of his report, West made the following comment:

> After thoroughly examining the fire scene, it is my opinion that if the insured accidentally dropped the charcoal grill in the kitchen area on the concrete slab floor with linoleum flooring, the fire would have remained small and would not have spread rapidly throughout the structure until Mr. Rakkar could have had time to go obtain help to extinguish the fire. With the evidence found at the fire scene, there is no way that the charcoal grill being dropped caused this fire.

This comment fails to take into consideration the written statement Rakkar gave St. Paul in which he stated that, when he came to after passing out, the "[c]abinets were on fire. The pit was near the base of the cabinets," which suggests that one or

---

1. A representative of the mortgagee testified that it received St. Paul's check on May 8 or May 9.

more of the coals rolled up against the cabinets and set them on fire. Nor does West's comment take into consideration the fact that Rakkar was not certain how long he passed out (although he thought that it was only five or six minutes) or the fact that it took him another fifteen to twenty minutes to summon help. West's report cites no facts to support the conclusion that Rakkar could have summoned help to extinguish the fire. No mention is made in the report of how long it took Rakkar to summon help. West's report also contains inconsistencies between his conclusion that the fire was intentionally set using flammable liquids and Dr. Armstrong's failure to find any identifiable flammable materials in the samples taken from the house. These factors are some evidence that a reasonable insurance company would not have relied on the investigator's report.

■ Additionally, a fact question existed regarding St. Paul's reliance on the investigator's report. Eric Grant, a claims supervisor with St. Paul, testified that he made the decision to deny coverage to Rakkar. A principal reason for denying the coverage, he stated, was Dr. Armstrong's finding traces of leaded petroleum in the sample taken from the kitchen near the hibachi grill. Dr. Armstrong's report, however, made no such finding. Dr. Armstrong's conclusion, which was also quoted, in part, in West's report, stated:

DATA ANALYSIS ESTABLISHED:

The soot on the concrete from Sample 3 was positive for lead and manganese. Lead, bromine and manganese are elements associated with the residue of a leaded petroleum fuel.

\* \* \* \* \* \*

SUMMARY:

\* \* \* \* \* \*

Sample 3, concrete—positive for lead and manganese; *negative for identifiable composition.*

(Emphasis added.) Nowhere in his report did Dr. Armstrong state that "leaded petro-

leum fuel" or any other identifiable flammable compound was present in any of the samples taken from the house. During cross-examination of Grant, however, the following exchange took place:

Q Did you understand it to be Dr. Armstrong's opinion that he found traces of leaded gasoline in one of the samples taken from the house?

A Yes.

\* \* \* \* \* \*

Q What significance did Dr. Armstrong's opinion, as you understood it to be, have on your denying the claim?

A He did identify leaded petroleum in one of the samples.

\* \* \* \* \* \*

Q So, if Dr. Armstrong had not made that finding, as you understand it to be, the claim would have been paid; correct?

A Possibly.

Because Grant, who was the official making the final decision to deny the claim, believed that Dr. Armstrong's report stated that traces of gasoline were present in the house, when the report made no such finding, a fact question existed on whether St. Paul actually relied on the report in making its decision to deny the claim. Accordingly, St. Paul's no-evidence and matter-of-law points lack merit. We overrule the first, second, and third points of error.

### BASIS FOR RECOVERY UNDER ARTICLE 21.21, SECTION 16

■ In points four through seven, St. Paul contends that the trial court erred in awarding treble damages because Rakkar failed to establish entitlement to recovery under any of the bases for recovery under article 21.21, section 16 of the Texas Insurance Code. TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp.1992). In its brief and at oral argument, St. Paul focused its arguments on jury question 3 and the trial court's written findings relative to this question.[2] In jury question 2, the jury

---

**2.** In question 3, the jury was asked whether St. Paul "engaged in any unfair method of competition in the business of insurance, which was a producing cause of damages to Dr. Rakkar." "Unfair method of competition in the business of insurance" was defined in the question using the general definition of "misrepresentation" given in section 21.4 of title 28 of the Texas Administrative Code. The jury answered this question "yes." At trial, St. Paul objected to this

found that St. Paul had breached its duty of good faith and fair dealing to Rakkar and that its breach was a proximate cause of damages to him.

In *Vail v. Texas Farm Bureau Mutual Insurance Co.*, 754 S.W.2d 129 (Tex.1988), the Texas Supreme Court held that an insurer's breach of the duty of good faith and fair dealing to an insured is an unfair or deceptive act under article 21.21, section 16 of the Texas Insurance Code. *Vail*, 754 S.W.2d at 135. Under *Vail*, the jury's finding in question 2 that St. Paul had breached its duty of good faith and fair dealing establishes a basis for recovery under article 21.21, section 16. Because the jury's answer to question 2 establishes a basis for recovery under article 21.21, section 16, any error in question 3 or in the trial court's written findings relative to question 3 is harmless. We overrule the fourth, fifth, sixth, and seventh points of error.

### "KNOWINGLY"

 In points eight and nine, St. Paul contends that the trial court erred in awarding treble damages because the jury's finding that St. Paul "knowingly" violated article 21.21, section 16 is unsupported by the record and was improperly submitted. In the tenth point, St. Paul contends that the trial court erred in entering a written finding that St. Paul acted knowingly in committing the conduct described in jury question 3. In the twelfth point, St. Paul contends that there is no evidence or else insufficient evidence to support the jury's answer to question 7, which inquired whether St. Paul acted "knowingly."

To recover treble damages under article 21.21, section 16, Rakkar had to prove and obtain a finding that St. Paul knowingly violated article 21.21, section 16. Tex.Ins. Code Ann. art. 21.21, § 16(b)(1) (Vernon Supp.1992). "Knowingly" is defined in article 21.21 as "actual awareness of the falsity, unfairness, or deception of the act or practice made the basis for a claim for damages under Section 16 of this Article. 'Actual awareness' may be inferred where objective manifestations indicate that a person acted with actual awareness." Tex.Ins. Code Ann. art. 21.21, § 2(c) (Vernon Supp. 1992).

The issue of whether St. Paul acted knowingly was submitted in jury question 7. That question asked the jury whether St. Paul "knowingly engaged in such conduct referred to in question numbers 3, 4, or 5." [3] "Knowingly" was defined in the question consistent with the definition in article 21.21, section 2(c). In its written findings, the trial court found that St. Paul knowingly "made the representations inquired about in question number 3." Neither the trial court's findings nor question 7 concerned whether St. Paul knowingly engaged in the conduct referred to in question 2, the breach of the duty of good faith and fair dealing. Accordingly, we cannot consider whether St. Paul knowingly breached its duty of good faith and fair dealing in determining whether there is any evidence to support the award of treble damages. [4]

Rakkar maintains that St. Paul made the following misrepresentations:

1. St. Paul's agent told Rakkar that St. Paul had an efficient claims department and was timely and reliable in processing claims;

question on the grounds that it was "confusing." The meaning of the jury's answer to this question with its garbled definition of a key term seems to have left the attorneys more confused than the jury.

3. Questions 4 and 5 inquired whether St. Paul committed certain specific acts.

4. At oral argument, Rakkar asked that we read question 6 as a finding by the jury that St. Paul knowingly breached the duty of good faith and fair dealing. Question 6, however, asked the jury whether St. Paul's conduct "amount[ed] to

such an entire want of care as to indicate that the conduct ... was a result of actual conscious indifference to the rights or welfare of Dr. Rakkar." The question defined "conscious indifference" as involving "heedless and reckless disregard of the rights, welfare or safety of the person ... affected by it." "Heedless and reckless disregard" and "actual conscious indifference" are a lower standard than the insurance code's definition of "knowingly" as "actual awareness." Therefore, question 6 cannot be interpreted to mean that St. Paul knowingly breached its duty of good faith and fair dealing.

2. St. Paul's special investigator promised to send Rakkar a proof-of-loss form within two weeks, but Rakkar did not receive the form until after he wrote to St. Paul requesting one after more than six weeks had passed;

3. St. Paul failed to rule on his claim within the prescribed time period;

4. St. Paul promised to pay off Rakkar's mortgage but did not send a check to the mortgage company for over four months, by which time Rakkar had already paid off the mortgage.

Although each of these promises and representations turned out to be false, nothing in the record indicates that the people who made the promises and representations had "actual awareness" of the falseness of the statements at the time they were made. Nothing in the record indicates that St. Paul's agent had actual awareness that St. Paul did not have an efficient claims department or that it was not timely and reliable in processing claims. The other broken promises could reasonably be construed to be the result of a slow-moving, bureaucratic business system. At worst, St. Paul was shown to be grossly negligent or reckless in delaying sending Rakkar the proof-of-loss form, ruling on his claim, or sending a check to Rakkar's mortgage company. Nothing in the record, however, indicates that St. Paul's agents and employees were aware at the time they made the promises that they would not be kept. We hold that there is no evidence to support the jury's and the trial court's findings that St. Paul knowingly made misrepresentations to Rakkar. Accordingly, Rakkar is not entitled to treble damages under article 21.21, section 16. The ninth and twelfth points are sustained.[5]

## ST. PAUL'S CONTRACTUAL LIABILITY UNDER THE POLICY

In points thirteen and fourteen, St. Paul contends that the trial court erred in awarding the $60,000 policy amount because Rakkar did not seek or obtain jury findings on his breach-of-contract claim. In the fifteenth point, St. Paul contends that the trial court erred in entering a written finding that Rakkar was entitled to contract damages of $60,000.

■■■■■ As St. Paul notes in its brief, a plaintiff waives any ground of recovery on which no element is submitted to the jury unless the ground is conclusively established by the evidence. *Akin v. Dahl*, 661 S.W.2d 911, 913 (Tex.1983); *State Farm Fire & Cas. Co. v. Miller*, 713 S.W.2d 700, 701–02 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); Tex.R.Civ.P. 279. The trial court, however, is not required to submit jury questions on undisputed facts. *Winn–Dixie Tex., Inc. v. Buck*, 719 S.W.2d 251, 253 (Tex.App.—Fort Worth 1986, no writ); *Hughett v. Dwyre*, 624 S.W.2d 401, 403 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). St. Paul maintains that Rakkar not only failed to prove breach of contract conclusively, but that Rakkar presented no evidence on his breach-of-contract claim. The record, however, demonstrates otherwise.

■■■■ To prove breach of contract, Rakkar had to establish: (1) the existence of the contract sued upon; (2) his compliance with the terms of the contract; and (3) St. Paul's breach of the contract. The following testimony by Grant established the first two of these elements:

[Cross-Examination]

Q Now, the Lake Limestone house, just to make sure that we have the correct understanding, there is no question as to whether or not it was insured at the time of the fire?

A That's correct.

Q Dr. Rakkar had paid his premiums?

A (No response.)

Q He had paid his premiums?

A Yes, to [the] best of my knowledge.

Q You would be familiar with that fact? If he had not paid his premiums, you would know that, wouldn't you?

A Right.

---

5. Because we hold under points nine and twelve that Rakkar is not entitled to treble damages under article 21.21, section 16, we need not consider points eight, ten, eleven, sixteen, seventeen, and nineteen, which also deal with the issue of treble damages.

Q You are familiar with a letter that was sent by your lawyer, Mr. Nicholas, dated January the 23rd?

A Yes, I am.

Q That is the letter wherein the insurance company notified Dr. Rakkar that it wasn't going to pay the claim?

A That is correct.

Q Did you authorize that letter?

A Yes, I did.

Q You understood the position the insurance company was taking was that Dr. Rakkar intentionally set the fire?

A Yes.

Q If the fire—let's assume something. Let's assume that the fire had not been intentionally set; I realize you are saying otherwise. But if you assume the fire is not intentionally set, what sum of money would have been paid under the policy?

A Sixty thousand dollars.

Q That was the maximum policy limits for that coverage?

A That is correct.

Q That is what would have been owed?

A Yes, sir.

 \* \* \* \* \* \*

[Direct Examination]

Q Has money ever been paid to [Dr. Rakkar] for this claim?

A No. It has not.

This testimony, which was uncontroverted, conclusively established the existence of the contract (the insurance policy), Rakkar's compliance with the terms of the contract (payment of premiums), and the damages sustained if St. Paul were in breach of contract ($60,000, the full amount of the policy). The only disputed issue was whether St. Paul breached the contract, and the only factual dispute on this issue was whether Rakkar intentionally caused the fire that destroyed his house. This disputed fact issue was submitted in question 1, to which the jury found that Rakkar did not intentionally burn down his house.

Because all of the other elements of breach of contract were conclusively established, Rakkar did not waive his breach-of-contract claim by failing to request jury questions on those issues. We overrule the thirteenth and fourteenth points of error.

Rule 279 permits the trial court to enter written findings on elements of a cause of action not submitted to the jury but supported by the evidence as long as at least one element of the cause of action was submitted to and answered favorably by the jury. TEX.R.CIV.P. 279. Here, the only disputed fact issue concerning St. Paul's breach of the contract was submitted to the jury in question 1, and the jury answered it favorably to Rakkar. Accordingly, rule 279 permitted the trial court to enter the written finding that $60,000 "was owed pursuant to the policy." [6] We overrule the fifteenth point of error.

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

At oral argument, Rakkar requested that this Court reform the judgment to grant recovery under his breach-of-duty-of-good-faith-and-fair-dealing claim if we held that he was not entitled to recover under his article 21.21, section 16 claim. A party that tries a case on alternative theories of recovery and obtains jury findings favorable on two or more theories has the right to a judgment on the theory entitling it to the greatest relief. *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). The prevailing party does not have to elect the theory under which it seeks recovery. *Id.* If the theory under which the trial court renders judgment is reversed on appeal, the party may seek recovery under an alternative theory. *Id.* The appellate court should consider the alternative theories and, if possible, render judgment thereon instead of remanding to the trial court for rendition of judgment under an alternative theory. *See Birchfield v. Texarkana Me-*

---

6. St. Paul relies on *State Farm Fire & Casualty Co. v. Miller* for its argument that Rakkar waived his breach-of-contract claim. In *Miller,* none of the jury questions were necessarily referable to the breach-of-contract claim. *See*

*Miller,* 713 S.W.2d at 702. Here, question 1's inquiry of whether Rakkar intentionally caused the fire is referable only to his breach-of-contract claim. *Miller,* therefore, is distinguishable.

*morial Hosp.*, 747 S.W.2d 361, 367–68 (Tex. 1987); *Chitsey v. National Lloyds Ins. Co.*, 738 S.W.2d 641, 643 (Tex.1987); Tex. R.App.P. 81(c). Here, Rakkar sued St. Paul for breach of its duty of good faith and fair dealing as well as for violations of the Deceptive Trade Practices–Consumer Protection Act and the Texas Insurance Code. The jury returned findings favorable to Rakkar on his actions for breach of the duty of good faith and fair dealing [7] as well as violations of the Texas Insurance Code. Because we have held that Rakkar cannot recover treble damages under the Texas Insurance Code, we must determine whether Rakkar can recover the next highest award of damages under the jury's findings: breach of the duty of good faith and fair dealing with the $115,000 punitive damages found by the jury.

To establish a breach of the duty of good faith and fair dealing, Rakkar had to prove that St. Paul had no reasonable basis for denying the claim and that St. Paul knew or should have known that there was no reasonable basis for denying the claim. *See Aranda*, 748 S.W.2d at 213; *Caserotti v. State Farm Ins. Co.*, 791 S.W.2d 561, 566 (Tex.App.—Dallas 1990, writ denied). Exemplary damages are recoverable under the same standard as in other tort cases, that is, on a showing that St. Paul acted recklessly or with conscious disregard for Rakkar's rights and welfare. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex.1983); *National Union Fire Ins. Co. v. Dominguez*, 793 S.W.2d 66, 73–74 (Tex. App.—El Paso 1990, writ denied). Grant's testimony that St. Paul "possibly" would have paid the claim if Dr. Armstrong's report had not indicated the presence of gasoline in one of the samples, when Dr. Armstrong's report in fact did not positively indicate the presence of gasoline (or any other identifiable flammable compound) in any of the samples, supports the jury's finding that St. Paul had no reasonable basis to deny the claim. Similarly, this evidence supports the deemed finding that St. Paul knew or should have known that it had no reasonable basis to deny the claim. This evidence, combined with St. Paul's apparent failure to compare its investigator's report of what caused the fire with Rakkar's written statement of how the fire occurred supports the jury's finding that St. Paul acted recklessly or with actual conscious indifference to the rights or welfare of Rakkar. Therefore, we will reform the judgment to provide recovery for Rakkar under his claim for exemplary damages for breach of the duty of good faith and fair dealing.

## PREJUDGMENT INTEREST

In the eighteenth point, St. Paul contends that the trial court erred in fixing the rate of prejudgment interest at ten percent instead of six percent. Under article 5069–1.05 of the Texas Revised Civil Statutes, judgments generally earn interest at the rate of ten percent. Tex.Rev.Civ. Stat.Ann. art. 5069–1.05, § 2 (Vernon Supp. 1992). Judgments based on contracts earn interest at the rate specified in the contract. *Id.* § 1(1). If no interest rate is specified in the contract and the contract is for an ascertainable "sum payable," then the contract earns interest at the rate of six percent. *Id.* art. 5069–1.03. For the six-percent rate to apply, the contract must "provide the conditions upon which liability depends and that it fix 'a measure by which the sum payable can be ascertained with reasonable certainty.'" *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex. 1988) (quoting *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 567 (Tex. 1984)). In this case, the insurance policy provided that St. Paul's maximum liability under the policy was $60,000. Because Rakkar's claim was for a total loss by fire, his claim was a liquidated demand against St. Paul for the full amount of the policy. *See* Tex.Ins.Code Ann. art. 6.13 (Vernon 1981). Accordingly, we hold that the policy constitutes a contract for an ascertainable sum payable within the meaning of article 5069–1.03. *Cf. Dolenz v. American Gen.*

---

7. In question 2, the jury found that St. Paul had breached the duty of good faith and fair dealing. In question 6, the jury found that St. Paul's conduct amounted to such an entire want of care as to indicate that the conduct complained of was a result of actual conscious indifference to Rakkar's welfare and rights.

*Fire & Casualty Co.,* 798 S.W.2d 862, 864 (Tex.App.—Dallas 1990, writ denied). We sustain the eighteenth point and modify the judgment to order a six-percent interest rate for prejudgment interest on the $60,-000. The $2000 awarded as damages for mental anguish is subject to a ten-percent rate. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a), (g) (Vernon Supp.1992). The $115,-000 punitive damages is not subject to prejudgment interest. TEX.CIV.PRAC. & REM. CODE ANN. § 41.006 (Vernon Supp.1992).

The trial court's judgment is affirmed in part and reversed and rendered in part.