**TEXAS FARMERS INSURANCE COMPANY, Appellant,**

v.

**Cloteal L. CAMERON, et al., Appellees.**

**No. 05–99–00222–CV.**

Court of Appeals of Texas, Dallas.

Feb. 29, 2000.

Rehearing Overruled Aug. 21, 2000.

---

1. The State has not discussed *Heberling* in either its briefs or at oral submission.

Sue Walker, Law Office of Sue Walker, Fort Worth, for Appellant.

Nina Cortell, Anne M. Johnson, Haynes & Boone, L.L.P., Dallas, David E. Keltner, Jose, Henry, Brantley & Keltner, L.L.P., Fort Worth, for Appellee.

Before Justices LAGARDE, JAMES, and ROACH.

## OPINION

SUE LAGARDE, Justice.

Appellant Texas Farmers Insurance Company ("Farmers") appeals the trial court's judgment, after a jury trial, awarding appellees Cloteal L. Cameron and Alfred L. Cameron: (1) damages on their extracontractual, bad-faith claims against their insurer Farmers; (2) damages for Farmers' failure to promptly reject the Camerons' claim, pursuant to article 21.55 of the Texas Insurance Code, together with prejudgment interest on those damages; (3) damages on the Camerons' claims for mental anguish; (4) additional damages, pursuant to article 21.21, section 16(b)(1) of the Texas Insurance Code and to section 17.50(b)(1) of the Texas Deceptive Trade Practices Act, because the jury found that Farmers acted knowingly and intentionally; and (5) attorneys' fees in the event of an appeal. In five issues, Farmers argues that the evidence is legally and factually insufficient to support the jury's various findings. In three further issues, Farmers argues that the trial court erred in applying article 21.55 of the Texas Insurance Code, awarding prejudgment interest on the 21.55 damages, and in compounding the 21.55 damages and the prejudgment interest. In a ninth issue, Farmers argues that the trial court erred in assessing attorneys' fees on the Camerons' contractual claims against Farmers. Finally, in a tenth issue, Farmers argues that the trial court erred in unconditionally assessing attorneys' fees in the event of an appeal.

The jury awarded the Camerons exemplary damages in the amount of $1,500,000, based on its finding that Farmers acted with malice; the trial court, however, disregarded this particular jury finding. As a result, the Camerons cross-appeal, assigning error to the trial court's disregarding the jury's malice finding, and arguing that the evidence was sufficient to support the jury's finding of malice.

We resolve against Farmers its first three issues, its fifth and sixth issues, and its eighth issue. To the extent that Farmers' fourth issue raises the legal sufficiency of the evidence to support Alfred's claim for mental anguish damages, we resolve that issue in Farmers' favor and do not reach the question of the factual sufficiency of the evidence to support Alfred's claim for mental anguish damages. We resolve Farmers' seventh and ninth issues in its favor. We resolve Farmers' tenth issue, in part, in its favor. We resolve the Camerons' cross-issue against them.

We reverse that portion of the trial court's judgment awarding Alfred past

mental anguish damages and render judgment that Alfred take nothing on his claim for past mental anguish. We reverse that portion of the trial court's judgment awarding prejudgment interest on the article 21.55 damages and, because the trial court awarded prejudgment interest in an aggregate sum, without segregating the prejudgment interest awarded for the article 21.55 damages, we remand this cause to the trial court to recalculate the total amount of prejudgment interest due the Camerons in light of our decision reversing the prejudgment interest award on the article 21.55 damages. We reverse in part that portion of the trial court's judgment awarding the Camerons appellate attorneys' fees, and we remand this cause to the trial court for reconsideration of the amount of appellate attorneys' fees. In all other respects, we affirm the trial court's judgment.

### Factual and Procedural Background

On Sunday, March 19, 1995, around 4:00 a.m., a fire destroyed the Camerons' residence and most of its contents. Neither Alfred Cameron nor his wife Cloteal was present at the time. Farmers was the insurer, and the Camerons' insurance policy had limits of $60,000 for the residential structure and $36,000 for the contents. The evidence was overwhelming that the setting of the fire was arson, and even Paul Sanders, an expert witness who testified on the Camerons' behalf, agreed that the fire was incendiary.

After the Camerons reported the fire to Farmers, Wendy High, a claims adjuster, drove past the remains of the house. Concluding that the Camerons would need temporary living expenses, High authorized a $500 advance for the Camerons. On Tuesday, March 22, High met with the Camerons, public adjuster Curtis Hordge, and two contractors (one to assess damage to the structure and the other to the contents). She gave the Camerons the $500 check. She did a walk through of the residence and a basic inventory, noting items that would have been worth more than $100. She also gave the Camerons the appropriate claim forms to fill out and explained the forms to them. On May 1, 1995, the Camerons executed a sworn proof of claim, which reflected that the actual cash value of the structure was $60,000, with a replacement value of $75,000; the actual cash value of the contents was $65,000, with a replacement value of $75,000. The Camerons claimed $60,000 for the loss or damage of the structure and $36,000 for the loss or damage to the contents, the full limits of the policy.

Hordge assisted the Camerons in compiling an itemized inventory of their losses. Hordge took about six weeks before submitting anything to High. High noticed some discrepancies between her own rough inventory and Hordge's. When High did her walkthrough, for example, she noticed two sofas; at the time, Cloteal told her that one sofa was worth about $1,000 and the other was worth between $1,500 and $1,800. Hordge's inventory, however, valued the sofas at more than twice those amounts.

Both Camerons had alibis for the time of the fire. Alfred had left Dallas around 7:00 p.m. on Saturday, March 18, to go to the Horseshoe Casino in Shreveport, Louisiana. A friend, John McCrumbly, accompanied him. The two men left the casino around 4:00 a.m. on Sunday, March 19, and arrived back home in Dallas around 7:00 a.m. Cloteal was at her daughter's apartment assisting her packing for an anticipated move. Cloteal arrived at her daughter's apartment around 6:00 p.m. on Saturday, March 18. The two women got take-out food from Colter's Barbecue and returned to the apartment. Because her daughter had only one bed, the two slept in it together. Between 7:00 and 8:00 a.m. the next morning, Alfred telephoned to tell Cloteal about the fire. McCrumbly vouched for Alfred's whereabouts, and Cloteal's daughter, Sherlitrice Spencer, vouched for Cloteal's.

On August 3, 1995, McCrumbly executed an affidavit confirming Alfred's alibi. On August 11, Spencer executed an affidavit confirming Cloteal's alibi. The affidavits were forwarded to Farmers. Tony Poncio, the branch claims manager for Farmers, reviewed the affidavits. Without interviewing either McCrumbly or Spencer personally, he rejected the Camerons' claim. Poncio took the position that "their testimony was already in front of us signed and notarized. There was nothing else to look into about it."

On September 18, 1995, Poncio wrote the Camerons a letter informing them that Farmers was denying the claim. The reason given was that Farmers had "a good faith belief that the fire in question was caused intentionally by you or by persons instructed by you to set the fire." The letter went on to accuse the Camerons of making material misrepresentations when Farmers' representatives investigated the claim. Poncio quoted in full the policy provision concerning concealment or fraud, which stated that, in the event of an insured's intentional concealment or fraud relating to a material fact, "[t]his policy is void." The text of Poncio's letter, however, did not actually declare the policy void; it simply stated that the Camerons' alleged misrepresentations were an additional reason for denial of the claim.

All this time, however, Farmers had been paying the Camerons temporary living expenses. Because High wanted to give the Camerons "enough time to figure out where they needed to go," checks for these expenses continued throughout the month of September, despite the rejection in mid-September of the Camerons' claim. From the days immediately after the fire through September, Farmers made nine payments for a total of $10,044.62. At the same time, High did not investigate further the discrepancies she noticed between her contents work sheet and the itemized list provided by Hordge. Although she normally would reinvestigate if there were discrepancies between her contents work

sheet and a proof of claim submitted by an insured, she did not do so in the Camerons' case: by the time she "got [her] contents work sheet and investigation through management," Poncio had already denied the claim.

The Camerons sued Farmers for breach of contract, breach of the duty of good faith and fair dealing, violations of the Deceptive Trade Practices Act ("DTPA"), and violations of the Texas Insurance Code. The jury found that neither Alfred nor Cloteal had, directly or indirectly, intentionally set the fire. It further found that neither Alfred nor Cloteal had concealed or misrepresented any material fact. On the contractual claim, it awarded the Camerons $60,000 as damages for the destruction of the structure and $36,000 as damages for the destruction of the contents. The jury found that Farmers had breached its duty of good faith and fair dealing to the Camerons and, as a result, awarded Alfred $252,000 as damages for his mental anguish and Cloteal $336,000 as damages for her mental anguish. It further found that Farmers had engaged in an unfair claim settlement practice, resulting in the same amount of damages that the jury had awarded in its responses to the earlier jury questions. It found that Farmers had engaged in such conduct both knowingly and intentionally and awarded $500,000 in additional damages as a result, pursuant to both the DTPA and the Texas Insurance Code. Finally, it found that Farmers acted with malice and awarded additional damages of $1,500,000. Farmers moved for judgment n.o.v. or, alternatively, for the trial court to disregard the jury findings.

The trial court disregarded the jury's finding that Farmers acted with malice, but otherwise rendered judgment on the jury's verdict. The judgment awarded the Camerons their contractual damages totaling $96,000. Pursuant to article 21.55 of the Texas Insurance Code, the judgment awarded the Camerons damages of $52,786.85 because of Farmers' delay in

rejecting the Camerons' claim. It also awarded $80,000 in attorneys' fees through trial. It awarded Alfred $252,000 for his past mental anguish and Cloteal $336,000 for her past mental anguish caused by Farmers' breach of its duty of good faith and fair dealing. It also awarded prejudgment interest. It awarded the Camerons damages of $500,000 resulting from Farmers' unfair claim settlement practices as "statutory additional damages." It awarded attorneys' fees of $10,000 in each of the events of: (1) an appeal to the court of appeals; (2) the filing of a petition for review to the Texas Supreme Court; and (3) the granting of review by the supreme court. Finally, it ordered postjudgment interest to be paid until the judgment was paid in full.

After this appeal was perfected, Farmers agreed to pay the Camerons $96,000, plus interest, on the Camerons' contractual claims. Consequently, only the extracontractual claims remain in controversy.

Farmers' first five issues question whether the evidence is legally and factually sufficient to support the jury's findings that: (1) Farmers breached its duty of good faith and fair dealing; (2) Farmers engaged in any unfair claim settlement practice that was a producing cause of damage to Alfred and Cloteal Cameron; (3) Farmers acted "knowingly" or "intentionally" in its conduct, in violation of the DTPA and the Texas Insurance Code; (4) Alfred suffered past mental anguish for three years; and (5) Cloteal suffered past mental anguish for three years.

In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the jury's finding, and we must disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support a finding, then the no-evidence challenge fails. *See Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979).

When the evidence offered to prove a vital fact is so weak it does nothing more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds of the existence of a vital fact, then there is some evidence. *Kindred,* 650 S.W.2d at 63.

In addressing a factual-sufficiency-of-the-evidence challenge upon a jury verdict, an appellate court must consider and weigh *all* of the evidence, not just that evidence which supports the verdict. *City of Princeton v. Abbott,* 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied); *see Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

High was the most subordinate person at Farmers working on the Camerons' claim. She took an initial inventory of the house's contents but never followed up to complete the inventory, because Farmers rejected the Camerons' claim before she could get management's permission to proceed. Neither Poncio, the branch claims manager, nor High, nor High's immediate supervisor, Lynn Wells, made any attempt to speak to the Camerons' alibi witnesses, McCrumbly or Spencer. Poncio felt that the alibi witnesses, who produced sworn affidavits to their whereabouts with the

Camerons at the time of the fire, would not have said anything different in a live interview. Thus, he concluded that it was pointless to follow up on the alibi witnesses.

Nonetheless, Farmers concluded that the cause of the fire was arson, although Poncio did not believe that Alfred personally set the fire. Farmers received authorization to check the Camerons' financial records and learned that they had about $3,000 in savings, a relatively small amount given the salaries they earned (a total of about $90,000 annually). Thus, Poncio concluded, the Camerons had a possible financial motive for arson. What the Camerons might have had in their teacher retirement accounts never came up; Poncio explained that the retirement accounts were irrelevant because they could not be used for day-to-day expenses before retirement.

The Camerons estimated their contents loss at about $53,000. Farmers met with the cleaning companies, Hordge, and the Camerons to figure out what was salvageable. But Farmers could not get a determination of what was salvageable, because Hordge would not allow it. Yet in a response to interrogatories, Farmers estimated the contents damage to be less than $36,000. The fire marshal at the scene told Farmers that Alfred had gambling debts, another indicator of financial problems. Yet Farmers did not pursue that angle. When asked why not, Poncio simply said, "I don't know why we didn't get any more information on the gambling debt." Farmers also obtained copies of the Camerons' credit reports. The Camerons made late credit card payments within the twenty-four-month period before the preparation of the credit reports, but they were current on all their debts at the time of the fire.

The Camerons had once owned rental property. While a tenant lived there, a fire broke out in the early morning of November 29, 1992. The cause was a malfunction of a wall heater or combustible material that got too close to the wall heater. At the time, the Camerons had the rental property insured with Delta Lloyds Insurance Company. The policy was only four months old at the time of the fire. Alfred signed a proof of loss claim for that fire. Delta Lloyds paid $21,328.83 in policy proceeds to the Camerons. Even so, Poncio did not ask Delta Lloyds to see its file on the Camerons, nor did he ask the Camerons for authorization to obtain those records.

Paul Sanders, an adjuster who worked in the claims department of Employers Casualty Insurance Company for thirty-nine years, was an expert witness retained by the Camerons. He concluded that Farmers did not investigate the case completely. He never knew of an insurance company that failed to contact an alibi witness. There was no evidence in the file of any gambling debts that Alfred might have had, and, in Sanders's opinion, nothing in the credit reports suggested a financial motive for arson, because the Camerons' debt was not that much. Farmers performed what Sanders thought might be an "outcome determin[a]tive investigation." Sanders believed that Farmers should have paid the Camerons' claim. Sanders further believed that, when Farmers voided the Camerons' policy, it should have returned a pro rata share of the premiums already paid. He had never seen an insurance company void a policy and refuse to return the premiums. Farmers conceded that it was obligated under the policy to pay off the Camerons' mortgage to their mortgagee, Bank United, but it did not do so. Poncio testified that he had written Bank United twice, asking it to submit a proof of loss claim, but Bank United did not respond. Sanders, however, testified that he had never seen an insurance company require a sworn proof of loss from a mortgagee when the insured had already submitted a sworn proof of loss. He said that any doubts that Farmers might have had in the payoff amount would normally be re-

solved by a simple telephone call. We conclude that this evidence is legally sufficient to support the jury's findings that Farmers breached its duty of good faith and fair dealing with the Camerons; that Farmers engaged in an unfair claim settlement practice; and that Farmers acted knowingly or intentionally.

With respect to the jury's findings that Alfred and Cloteal suffered past mental anguish, Alfred testified that Farmers brought in a dog to investigate the fire. He began to think that Farmers suspected arson and that he was the suspect. That thought made Alfred feel bad, because he had no record and did not consider himself a criminal. Meanwhile, the city condemned the house and boarded it up. When Farmers did not pay on the insurance policy, the Camerons fell into arrears in paying the mortgagee, which threatened foreclosure. The Camerons sold the house, "as is," in order to pay off the mortgage. As a result of Farmers' refusal to pay, Alfred noticed his wife lose interest in her church affairs. She became somewhat irritable all the time, and the relationship between Alfred and Cloteal became strained. Finally, far from having bad credit, Alfred was able to purchase a new house, mortgaged by First Nationwide. He had no gambling debts; the casinos do not even allow gambling on credit.

█ Cloteal testified that she was terrified at being accused of being an arsonist. When friends asked her whether the insurance company had made good on her loss, she had to tell them that it had not done so and then felt compelled to explain why. She felt humiliated and wondered what her friends thought of her. She came down with crying spells and took some time off from her work as a schoolteacher because she did not want the other teachers or children to see her condition. She had known her pastor for over twenty-five years. She started attending his church when she first moved to Dallas and joined him when he founded Red Sea Missionary Baptist Church about eighteen years earlier. She was a founding member of that church. Her church duties included handling between twenty-five and thirty thousand dollars of church funds. Yet Farmers' insinuation of arson caused her to resign her positions of authority that she had held in the church. She could neither eat nor sleep, and she started taking prescription medication for insomnia. She lost over fifty pounds and became irritable around those who cared for her.

█ Mental anguish is defined as intense pain of body or mind or a high degree of mental suffering. *Phar–Mor, Inc., v. Chavira,* 853 S.W.2d 710, 712 (Tex. App.-Houston [1st Dist.] 1993, writ denied). It is something more than mere worry, anxiety, vexation, or anger. *Id.* It is more than disappointment, resentment, or embarrassment. *Id.* To recover for mental anguish, the Camerons must prove such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation. *Id.* A mental anguish damages award requires evidence of a high degree of mental pain and distress that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Stevens v. National Educ. Ctrs., Inc.,* 43 Tex. Sup.Ct. J. 290, 290, 11 S.W.3d 185, 185 (2000) (per curiam).

█ To recapitulate, Alfred testified that he "felt bad" when Farmers accused him of being an arsonist. He was upset at the accusation because Farmers was saying that he was "some type of criminal." That Farmers persisted in accusing him of arson, even during the trial, made him mad. This testimony is the entirety of the evidence reflecting Alfred's mental state. It shows no more than that he suffered vexation, anger, and resentment. Indeed, his statements on his mental state are entirely conclusory, without detailing any specific effects or symptoms. We hold that the evidence is legally insufficient to support the jury's finding that Alfred suffered past mental anguish. As a result,

we do not reach the question whether the evidence was factually sufficient to support the jury's finding as to Alfred. We resolve Farmers' fourth issue in its favor and render judgment that Alfred take nothing on his claim for past mental anguish.

 Cloteal testified that she was "terrified" at the accusation. She felt devastated going to work. She walked the floor at night and could not sleep. She took prescription medication for her insomnia. She reduced dramatically her participation in church activities. This testimony, unlike Alfred's, evidences a high degree of mental pain and distress, with specific detail of that degree. An award of mental anguish damages can survive a legal sufficiency challenge when a plaintiff has introduced direct evidence of the nature, duration, and severity of her mental anguish. *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Such evidence can take the form of the claimants' own testimony. *Id.* We conclude that the evidence is legally sufficient to support the jury's finding that Cloteal had suffered past mental anguish during the three years between the fire and the trial.

 We now address the factual sufficiency of the evidence to support the jury's findings. To establish a breach of the duty of good faith and fair dealing, the Camerons had to prove that Farmers had no reasonable basis for denying the claim and that Farmers knew or should have known that there was no reasonable basis for denying the claim. *See St. Paul Ins. Co. v. Rakkar,* 838 S.W.2d 622, 631 (Tex. App.-Dallas 1992, writ denied). As we have said, the evidence was undisputed that the cause of the fire was arson. Although there was no evidence that either of the Camerons had set the fire, neither was there anything in the Cameron file to implicate any other arson suspect.

The policy that the Camerons had with Farmers had been in effect about three months before the fire. Poncio testified that a claim on a new policy is a possible

arson indicator. There was some question whether certain items on Hordge's contents list were actually inside the house at the time of the fire; when High did her walkthrough, she noticed some of the items outside the house. Apparently, however, nothing of any real or sentimental value was removed from the house before the fire, although arsonists will frequently remove valued items from the premises before they set the fire. Cloteal testified that she lost irreplaceable family photographs in the fire, including photographs of her deceased father and other deceased relatives.

When Cloteal's father became ill with cancer, the Camerons took him in to care for him. He ultimately died in the house. Shortly after his death, Cloteal put the house up for sale. She did not want to be reminded of her father's death. A few days before the fire, Cloteal told her daughter that she thought they had a buyer for the house and, in fact, an earnest money contract was signed the day before the fire. The agreed sales price was $46,-500. Although the house was insured for more than it was worth, Alfred estimated the value of the contents at $53,000. Thus, according to the Camerons, they had a net financial loss.

When High first met with the Camerons after the fire, she gave them $500 for temporary living expenses. She let the Camerons pick out a temporary place of their choice to stay. She did not know at the time that Alfred, who was temporarily estranged from Cloteal, had already rented an apartment of his own. Cloteal did not think that any marital problems between Alfred and her were any of Farmers' business. Farmers ultimately paid the Camerons a total of $10,044.62 in temporary living expenses. The payments continued throughout the month of September, even after Farmers had rejected the claim. When asked why Farmers continued to make additional payments, High replied that she wanted to give the Camer-

ons "enough time to figure out where they needed to go."

Another claims investigator for Farmers, Craig Collinsworth, did another investigation. He noted that the house had been listed for sale for over six months before the fire. He also noted that the Dallas County tax records reflected an appraisal of $49,060 for the realty and improvements, although the policy limit for the structure was $60,000. His report ends with the notation that the Camerons' public adjuster, Hordge, was coordinating a time when Collinsworth could meet with the Camerons to obtain their statements. After Collinsworth had obtained the statements, he would submit a "follow up report." The record does not reflect that a follow-up report was ever done, nor does it reflect why it was not done, if in fact it was not done.

In addition to the fire the Camerons suffered in their rental property, Cloteal had a 1988 Cadillac that was stolen and stripped twice and had its "continental kit" stolen. These thefts resulted in three separate insurance claims within a few years of the fire. Finally, Cloteal had also submitted an insurance claim involving a Pontiac that was stolen and never recovered.

That the cause of the fire was arson appears undisputed. That the Camerons were the arsonists, however, was not established. Although High noticed some discrepancies between her working contents list and Hordge's, High never did a follow-up or inquired further into those discrepancies. She said merely that, by the time she would have obtained management's approval to proceed, the Camerons' claim had already been rejected. Similarly, the record does not show any follow-up by Collinsworth to his preliminary investigation, and Farmers did not attempt to explain why. The Dallas County taxing authorities assessed the value of the structure at $49,060, and the Camerons had just received an offer from a prospective purchaser for $46,500. The structure was insured for $60,000. Nonetheless, there was evidence that the fire represented a net financial loss to the Camerons. There was no evidence that anyone had preserved valuables by removing them from the house before the fire. The Camerons had filed claims with their insurer before, once for a fire at a rental property they owned and four times for the theft of and damage to motor vehicles. But there was absolutely no evidence whatsoever that these incidents entailed any insurance fraud and, indeed, although Farmers knew about the earlier fire in the rental property, it made no effort whatsoever to investigate it. Although Farmers knew when it denied the Camerons' claim that it was obligated to pay off the bank mortgage, it did not do so and made only a nominal effort to contact the bank. Farmers did not even interview the Camerons' alibi witnesses. There was conflicting evidence on the Camerons' financial condition and, aside from an unobjected-to hearsay statement, no evidence that Alfred had any gambling debts. Sanders, the Camerons' expert, testified that Farmers' investigation into the claim was incomplete and, in many respects, unlike how Sanders would have expected an insurer to conduct an investigation. Sanders concluded that Farmers' investigation was possibly an "outcome determin[a]tive investigation." Consequently, we cannot say that the jury's findings that Farmers breached its duty of good faith and fair dealing, engaged in an unfair claim settlement practice, and acted knowingly or intentionally in violation of the DTPA and the Texas Insurance Code, were so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We resolve Farmers' first three issues against it.

■ We now consider the factual sufficiency of the evidence to support the jury's finding that Cloteal suffered mental anguish. We do so, mindful that jurors are best suited to determine whether and to what extent the defendant's conduct caused compensable mental anguish by referring to their own experience. *St. Eliza-*

beth Hosp. v. Garrard, 730 S.W.2d 649, 654 (Tex.1987), overruled on other grounds, Boyles v. Kerr, 855 S.W.2d 593 (Tex.1993). Although Cloteal did not suffer any physical injury, a party may recover damages for mental anguish without such an injury. Star Houston, Inc., v. Shevack, 886 S.W.2d 414, 418 (Tex.App.-Houston [1st Dist.] 1994), writ denied, 907 S.W.2d 452 (Tex. 1995) (per curiam). To recapitulate, Cloteal felt terrified, came down with crying spells, took time off from work, resigned her positions of authority in her church, lost her appetite, and incurred insomnia to such an extent that she went to a doctor to obtain prescription medication for that condition.

In Tidelands Auto. Club v. Walters, 699 S.W.2d 939, 940 (Tex.App.-Beaumont 1985, writ ref'd n.r.e.), Iva Walters was a member of Tidelands Automobile Club, through which she had a life insurance policy. She was killed in a one-vehicle accident, and Tidelands asked a justice of the peace whether her autopsy revealed any sign of intoxication. The justice of the peace replied that she was not intoxicated; in fact, she was a total abstainer. Tidelands altered the letter to indicate she had been intoxicated and forwarded the altered letter to the insurance company. When Zibia Walters, Iva's widower, filed a claim to collect the policy proceeds, the insurance company originally denied the claim. Zibia sued and, during the course of discovery, it transpired that the letter from the justice of the peace had in fact been altered. The insurance company hastily paid Zibia his claim, but Zibia pressed forward with a claim for mental anguish against Tideland. The jury found that Zibia had suffered severe emotional distress and awarded him $10,000 for it. On appeal, Tideland attacked the legal and factual sufficiency of the evidence to support the jury's finding. Id. at 944. The Beaumont court outlined Zibia's testimony about the manifestations of his distress:

> Upon being informed of the allegations that Mrs. Walters had been intoxicated

at the time of the accident, it "upset" him, he couldn't sleep at night, and he "couldn't get it off my mind, knowing that she didn't drink." He further testified he went to see a doctor, not really wanting to, but it "seemed to me I had to do something." He went on to say that when he heard about it he went into shock, he closed himself up in a room for several days and he just could not talk to his children. He stated he was upset and did not want to see anyone.

Id. at 945. His daughter testified that Zibia was very upset, nervous, and angry. He made comments that he would kill anyone responsible for the statement that Iva had been drunk. He had to go to bed for a few days because he could not concentrate and he could not comprehend what was going on. "It was," his daughter said, "just something that he couldn't handle." Id. His daughter confirmed that he consulted a doctor. Id. The Beaumont court held that the evidence was legally and factually sufficient to support the jury's finding. Id.

Yet the manifestations of severe emotional distress that Zibia described are nearly identical to those Cloteal described: being "upset," suffering insomnia, withdrawing from society, consulting a doctor, and not comprehending what happened. We conclude that the evidence was factually sufficient to support the jury's award of past mental anguish damages to Cloteal. We resolve Farmers' fifth issue against it, and we affirm that portion of the trial court's judgment awarding Cloteal $336,-000, together with prejudgment interest, for past mental anguish.

 Farmers' sixth issue asserts that the trial court erred in assessing damages pursuant to article 21.55, section 6, of the Texas Insurance Code in the absence of any pleading and proof that Farmers violated any provision of article 21.55. See TEX. INS.CODE ANN. art. 21.55 (Vernon Supp. 2000). The Camerons' live petition stated, "In addition, pursuant to Texas Insurance Code § 21.55(6), [the Camerons] are enti-

tled to Eighteen Percent (18%) per annum of the amount of damages as well as attorney fees." We hold that this statement, with a specific reference to article 21.55, section 6, sufficed to give Farmers fair notice of the Camerons' claim for damages under that article. *See* TEX.R. CIV. P. 47(a) (a pleading must give "fair notice" of the claim involved). Additionally, Farmers did not present any special exceptions to the trial court about the Camerons' article 21.55 claim. If Farmers considered the Camerons' claim obscure, it should have specially excepted to it, and its failure to do so has waived any defect in the pleading. *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982).

■ We also find the proof sufficient to support the Camerons' claim. The Texas Insurance Code provides:

> If the insurer has a reasonable basis to believe that the loss results from arson, the insurer shall notify the claimant in writing of the acceptance or rejection of the claim not later than the 30th day after the date the insurer receives all items, statements, and forms required by the insurer.

TEX. INS.CODE ANN. art. 21.55, § 3(b) (Vernon Supp.2000). An insurer unable to accept or reject the claim within this thirty-day period must notify the insured of its inability to do so and give the reasons for its inability. TEX. INS.CODE ANN. art. 21.55, § 3(d) (Vernon Supp.2000). Poncio testified that the Camerons' proof of claim was dated May 1, 1995. On June 1, 1995,[1]

Farmers sent the Camerons a letter stating that it wanted to examine both of the Camerons under oath. The letter concluded:

> Specifically, [Farmers], based on its investigation, believes that this fire was not an accidental fire, but rather was an apparently intentionally set fire. Because of this fact, my client will conduct a full investigation of all the facts and circumstances regarding the fire, including who might have a motive for setting the fire. [Farmers] is certainly not accusing you or any particular person of having set the fire and does not have sufficient investigation [*sic*] at this time to identify who may have set the fire. It is merely advising you of these circumstances so that you will know why its investigation may take a little longer than a normal fire loss insurance adjustment.

But the Texas Insurance Code has yet another provision: "Not later than the 45th day after the date an insurer notifies a claimant under [s]ubsection (d) of this section [*i.e.,* of its inability to accept or reject the claim within the thirty-day period], the insurer shall accept or reject the claim." TEX. INS.CODE ANN. art. 21.55, § 3(e) (Vernon Supp.2000). Forty-five days after June 1, 1995, was July 16, 1995. Therefore, by any calculation, Farmers' ultimate rejection of the Camerons' claim, dated September 18, 1995, was impermissibly late.[2] Consequently, Farmers violated

---

1. June 1, 1995, a Thursday, was the thirty-first day after May 1, 1995. The record does not clearly reflect when Farmers actually received the Camerons' proof of claim. In the interest of justice, we will presume that Farmers received the proof sometime after May 1, so that Farmers' response to the Camerons was timely under article 21.55, section 3(d), of the insurance code.

2. Farmers argues in its brief that the parties stipulated that Farmers received all the information it needed to decide what to do with the Camerons' claim on August 29, 1995. Therefore, Farmers concludes, its September 18, 1995 rejection of the Camerons' claim

was timely. The Camerons agree that they had such a stipulation, but argue that Farmers did not pay the claim within sixty days of August 29, 1995, in accordance with TEX. INS. CODE ANN. art. 21.55, § 3(f) (Vernon Supp. 2000). According to the Camerons, the claim should have been paid by no later than October 28, 1995. Both sides appear to overlook article 21.55, section 3(e), which operates to place an absolute cap on the amount of time that an insurer can take to accept or reject a claim. Parties, however, cannot concede a question of law necessary to the proper disposition of an appeal. *Jackson Hotel Corp. v. Wichita County Appraisal Dist.,* 980 S.W.2d 879, 881 n. 3 (Tex.App.-Fort Worth 1998, no

the provisions of article 21.55 of the insurance code. The proof was sufficient to support the trial court's award of damages under article 21.55. We resolve Farmers' sixth issue against it.

Farmers' seventh issue raises the question whether prejudgment interest is recoverable on the eighteen-percent penalty assessed under article 21.55, section 6. That section provides:

> In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article [requiring prompt payment or rejection of a claim], such insurer shall be liable to pay the holder of the policy, or the beneficiary making a claim under the policy, in addition to the amount of the claim, 18 percent per annum of the amount of such claim as damages, together with reasonable attorney fees....

TEX. INS.CODE ANN. art. 21.55, § 6 (Vernon Supp.2000). Although the statute speaks of awarding eighteen percent of the claim as "damages," it must mean exemplary damages, rather than actual damages, because the award is made without reference to any harm actually suffered by the insured. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(5) (Vernon 1997) (" '[e]xemplary damages' means any damages awarded as a penalty or by way of punishment," including punitive damages). Yet prejudgment interest may not be assessed or recovered on an award of exemplary damages. TEX. CIV. PRAC. & REM.CODE ANN. § 41.007 (Vernon 1997). Punitive damages, being inherently penal in character, should not be enlarged by the imposition of prejudgment interest in the absence of an express legislative intent to do so. *Ellis County State Bk. v. Keever*, 888 S.W.2d 790, 798 (Tex.1994). We know of no such legislative intent in connection with article

pet.); *Haas v. Voigt*, 940 S.W.2d 198, 201 n. 1 (Tex.App.-San Antonio 1996, writ denied) (citing *White v. Moore*, 760 S.W.2d 242, 243 (Tex.1988)). The stipulation between the par-

21.55, section 6, and the Camerons have not directed us to any evidence of such intent.

The Camerons do, however, cite a case in support of their position: *Bekins Moving & Storage Co. v. Williams*, 947 S.W.2d 568, 584 (Tex.App.-Texarkana 1997, no writ). Yet *Williams* gives no analysis other than to say that the statute uses the word "damages." *Id.* One other court of appeals has held that prejudgment interest should not be assessed on the eighteen-percent penalty. *Dunn v. Southern Farm Bureau Cas. Ins. Co.*, 991 S.W.2d 467, 479 (Tex.App.-Tyler 1999, pet. denied). *Dunn*, in turn, relied upon the calculations of damages and interest performed by the Fort Worth Court of Appeals. *See Marineau v. General Am. Life Ins. Co.*, 898 S.W.2d 397, 405–06 (Tex.App.-Fort Worth 1995, writ denied). *Accord, Teate v. Mutual Life Ins. Co.*, 965 F.Supp. 891, 894 (E.D.Tex.1997) (applying Texas law and declining to apply prejudgment interest to article 21.55 damages). We consider *Dunn* and *Marineau* to be the better reasoned authority and decline to follow *Williams*. We conclude that the trial court erred in awarding prejudgment interest on the article 21.55 damages. We resolve Farmers' seventh issue in its favor.

Farmers' eighth issue raises the question whether the trial court correctly calculated the amount of the article 21.55 award. It argues that the penalty should be computed as 18% of the policy coverage: "[t]he insurer should not be penalized for the plaintiffs' delay in getting to trial." It concludes:

> In computing the article 21.55 penalty, the judgment erroneously reduced a 18% $17,280 per year penalty to a per diem penalty and then multiplied that by the number of days between the last possible date for denial and the date of the judgment.

ties is of no legal effect in determining the timeliness of Farmers' rejection of the Camerons' claim.

Farmers asks us to reform the trial court's judgment to vacate the award of $52,768.85 under article 21.55 and to reform the judgment to reflect a penalty of $17,280. Farmers cites one case as authority. *Teate*, 965 F.Supp. at 893. That opinion held that "[t]he plain language of § 6 provides for a statutory penalty of 18 percent per annum of the amount claimed for damages. There is no term in the statute that requires the 18 percent per annum amount to be compounded annually." *Id.*

Yet Farmers would have us read the words "per annum" completely out of the statute. The Camerons argue that they "are entitled to receive 18% on $96,000, calculated on a yearly basis, from October 28, 1995 (60 days after the date all information was received by Farmers)[3] to November 13, 1998 (the date of judgment)."[4] We agree with the Camerons' method of calculation. We do not disagree with Farmers that the eighteen-percent penalty should not be compounded, but, contrary to what Farmers says, there is no indication that the trial court did compound the eighteen-percent penalty.[5] Through trial, until some time after the day of judgment, Farmers consistently refused to pay anything on the Camerons' claim. Because Farmers rejected the claim for more than three years, it had to pay the statutory penalty of eighteen percent per annum for the full three-year-plus period. To the extent that the statute may favor dilatory

insureds over insurers, Farmers should address its concerns to the legislature, not to the judiciary. Farmers gives us no reason why we should not apply the plain language of the statute. We resolve Farmers' eighth issue against it.

Farmers' ninth issue challenges whether the Camerons are entitled to attorneys' fees on their breach of contract claim. The issue is conditioned upon our having found that there is legally insufficient evidence to support the trial court's award of extracontractual damages under the DTPA and the Texas Insurance Code and the assessment of the article 21.55 penalty. Because we have concluded that the evidence was legally sufficient to support the Camerons' extracontractual damages and the article 21.55, section 6 penalty, we necessarily resolve Farmers' ninth issue against it and do not discuss it further.

Farmers' tenth issue questions whether the judgment improperly awards appellate attorneys' fees regardless of whether the Camerons prevail on appeal. We have recently held that a trial court may not grant a party an unconditional award of appellate attorneys' fees. *Weynand v. Weynand*, 990 S.W.2d 843, 847 (Tex.App.-Dallas 1999, pet. denied). To do so could penalize a party for pursuing a meritorious appeal. *Id.* An unconditional award of appellate attorneys' fees is improper. *Humble Nat'l Bk. v. DCV, Inc.*,

---

3. As we discuss in our disposition of Farmers' sixth issue, we do not necessarily agree that October 28, 1995, is the correct starting date, as opposed to July 16, 1995. The Camerons do not complain, however, that the trial court picked a belated date to start its calculation of the article 21.55 award and in fact accept October 28, 1995, as the date on or before which Farmers was obligated to pay the Camerons' claim. Any such mistake would only inure to Farmers' benefit. Therefore, we do not address the question whether the trial court used a mistaken starting date in its calculation.

4. The record reflects that the judgment was actually signed on November 16, 1998.

5. From October 28, 1995, to November 13, 1998 [using the figures as briefed], is a total

of three years and seventeen days. Seventeen days constitutes 0.0465 of a year (17 divided by 365, rounded off). The trial court simply multiplied the total time, 3.0465 years, by the rate, 18%, and the principal amount, $96,000. The result is exactly what the trial court assessed, $52,644.82 (rounded off to the nearest penny). But this calculation involves no compounding whatsoever. Simple interest is calculated by the formula "$i = p\,r\,t$," where "$i$" is interest, "$p$" equals the principal, "$r$" equals the rate of interest, and "$t$" equals the time over which the interest is to be calculated. Such a calculation simply does not compound the interest. Nothing in *Teate* indicates that there is anything wrong with the trial court's calculation.

933 S.W.2d 224, 236 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Such an error is harmless if an appellant has been ultimately unsuccessful in its appeal. *Id.* Therefore, to the extent that Farmers has been unsuccessful in this appeal, we find no reversible error in the trial court's failure to condition the award of appellate attorneys' fees on the Camerons' success in this Court. *Id.* To the extent that Farmers has been successful, the Camerons are not entitled to an award of appellate attorneys' fees for that portion of fees attributable to an unsuccessful defense of the case. *See Goldman v. Alkek,* 850 S.W.2d 568, 578–79 (Tex.App.-Corpus Christi 1993, no writ) (op. on mot. for reh'g). The determination of an award of attorneys' fees is a severable claim. *Id.* at 579. We therefore reverse the award of appellate attorneys' fees and remand to the trial court for a determination of the reasonable amount of appellate attorneys' fees to be awarded to the Camerons in view of the fact that Farmers was partially successful in this appeal. *See id.*

Finally, we resolve Farmers' tenth issue in its favor to the extent that it challenges the unconditional award of attorneys' fees on appeal to the Texas Supreme Court. *See Humble Nat'l Bk.,* 933 S.W.2d at 236. We order the trial court, when entering its new judgment, to provide that the Camerons are entitled to attorneys' fees on appeal to the Texas Supreme Court only in the event, and only to the extent, that Farmers' appeal is unsuccessful. *Id.*

### Cross–Appeal

■ In their cross-appeal, the Camerons assert that the trial court erred in disregarding the jury's finding that Farmers acted maliciously in its breach of good faith and fair dealing. The jury awarded the Camerons $1,500,000 in punitive damages because it found that Farmers had acted maliciously. The trial court disregarded this finding and refused to enter judgment on that amount.

■ It is settled that a trial court is authorized to set aside a jury finding only when there is no evidence to support the finding. *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex. 1978). In determining that there is no evidence to support a jury finding, the court must consider the evidence in the light most favorable to the finding, considering only the evidence and inferences that support the finding, and rejecting the evidence and inferences contrary to the finding. *Id.* The Texas Supreme Court, in a plurality opinion, has held that:

> punitive damages can be awarded for bad faith only when an insurer was actually aware that its actions involved an extreme risk—that is, a high probability of serious harm, such as death, grievous physical injury, or financial ruin—to its insured and was nevertheless consciously indifferent to its insured's rights, safety, or welfare.

*Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 57 (Tex.1997) (citing *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 22–23 (Tex.1994)); *see also Standard Fire Ins. Co. v. Stephenson,* 963 S.W.2d 81, 91 (Tex. App.-Beaumont 1997, no pet.) (following *Giles* ).

In this case, there was no evidence whatsoever that Farmers was actually aware that its actions involved an extreme risk. The Camerons certainly did not allege any death or grievous physical injury. They argued only financial ruin. As part of its investigation into the Camerons' claim, Farmers took the position that the Camerons were in poor financial health before the fire. Yet Farmers paid temporary living expenses for some six-and-a-half months. Alfred testified that, after the fire, he bought a new house with the proceeds of an eighty-five-thousand-dollar loan. He argues that he purchased the new house some two years after the fire, and his ability to obtain the loan meant only that his credit was still good. Nonetheless, his own testimony scarcely establishes that he or Cloteal suffered financial

"ruin." Undoubtedly, when Farmers rejected the Camerons' claim, they suffered a financial set-back, but, if such a set-back were all that was necessary to establish malice, an insurer would always be deemed to act maliciously whenever it rejects a claim for whatever reason. We resolve the issue raised in the Camerons' cross-appeal against them.

We reverse that portion of the trial court's judgment awarding Alfred $252,000 in past mental anguish damages (and prejudgment interest on that amount) and render judgment that Alfred take nothing on his claim for past mental damages.

We also reverse the trial court's judgment to the extent that it awards prejudgment interest on the article 21.55 damages and render judgment that the Camerons take no prejudgment interest on that portion of the damages award. Because the trial court awarded prejudgment interest in an aggregate sum without segregating the prejudgment interest on the article 21.55 damages, we remand this cause to the trial court for reconsideration of the amount of prejudgment interest that the Camerons should receive, excluding the article 21.55 award.

We also reverse that portion of the trial court's judgment awarding the Camerons appellate attorneys' fees. We remand this cause to the trial court for reconsideration of the appropriate amount of appellate attorneys' fees in light of this Court's disposition of the issues. We direct the trial court to award appellate attorneys' fees in the event of an appeal to the Texas Supreme Court only in the event, and only to the extent, that the Camerons prevail on such an appeal.

In all other respects, we affirm the trial court's judgment.