IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-02-00274-CR

 

Anibal Montanez 

a/k/a Ivan Montilla-Pena,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 217th District Court

Angelina County, Texas

Trial Court No. 21844

 



Opinion on remand



 








          Anibal Montanez appeals the denial of
a suppression motion in his prosecution for possession of more than 400 grams
of cocaine.  Montanez argues in his sole issue that the court abused its discretion by overruling the
motion because: (1) there was no lawful basis for the stop of his vehicle; (2) his
consent to search the vehicle was not freely and voluntarily given and; (3)
alternatively, the search exceeded the scope of consent given.  We will affirm. 

          On original submission, a majority of
this Court held that the State failed to prove by clear and convincing evidence
that Montanez freely and voluntarily consented to the search. See Montanez v. State, 143 S.W.3d 344, 348 (Tex. App.—Waco 2004). 
The Court of Criminal Appeals reversed and remanded because the majority
“applied the incorrect standard of review.”  Montanez v. State, 195
S.W.3d 101, 109 (Tex. Crim. App. 2006).

Background

          Investigator Jason Bridges of the Deep
East Texas Regional Narcotics Task Force stopped Montanez’s Nissan Pathfinder
because his license plate was obscured and the license plate light was not
working.  The entire encounter was recorded on a videotape which was admitted
at the suppression hearing.

          Bridges explained the violations to
Montanez and asked for his driver’s license.  Montanez provided a Massachusetts license, and Bridges asked where he was coming from.  Montanez told Bridges
he had been in Houston for four days visiting his uncle, friends, and his
“primo.”  Montanez explained that he was returning home to Massachusetts.  When
Bridges asked about the Pathfinder, which had New Hampshire plates, Montanez
said it belonged to a friend.  Bridges “assumed that [Montanez] borrowed it.” 
After speaking with Montanez for a few minutes, Bridges asked the passenger,
Francisco Martinez, about the trip.

          After talking with the two men,
Bridges “felt like some type of illegal activity was occurring” because the
Pathfinder was owned by an out-of-state third party, because Montanez and Martinez “were unsure” about the purpose for their trip, and because they did not know each
other’s names.  Bridges asked for Montanez’s consent to search the Pathfinder about
eleven minutes after stopping Montanez.  The videotape depicts the following
exchange between Bridges and Montanez:

          Bridges:                  Can I
search?

 

          Montanez:               Excuse
me?

 

          Bridges:                  Can
I search your vehicle?

 

          Montanez:               Repeat
please?

 

          Bridges: 
                You understood everything else I asked you.  Can I search your

                                      car? 
Can I look?

          

          Montanez:               Oh,
yeah.  No problem.

 

          Bridges:                  Do
you comprende?

 

          Montanez:               You
check out the car?

 

          Bridges:                  Si.

 

          Montanez:               Yeah,
no problem.

 

          Bridges:                  No
problem?  Do you comprende?

 

          Montanez:               Yeah.

 

          Bridges:                  Okay. 
It’s okay?

 

          Montanez:               Yeah.

 

          Bridges:                  Okay.

 

          Bridges noticed that “a brand-new,
large duffle bag” in the Pathfinder contained nothing but neatly folded clothes
which did not appear to have been worn.  He thought this was unusual because he
would have anticipated finding dirty clothes in the luggage if Montanez and Martinez had been in Houston four days as they had said.

          He “then started a basic search of the
vehicle.”  He first looked at the undercarriage of the Pathfinder and noticed a
fresh coat of paint, which he testified is “unheard of on older model
vehicles.”  He testified that based
on his experience this “usually” indicates the existence of a false compartment,
which is a “common concealment method” for sports utility vehicles.  Because
the occupants said they were traveling from Houston, Bridges’s suspicions were
further aroused because that city “is a major origin city” for contraband being
sent to northern states.  Bridges then searched
other areas of the Pathfinder to try to isolate the location of the suspected
compartment.  

          When
he lifted the carpeting in the rear of the van, he noticed “a lot of screws
missing that shouldn’t have been missing” and “brand-new bolts” in two areas. 
These alterations provided further suspicion to Bridges that there was a hidden
compartment underneath, “probably in the gas tank, and it was not feasible to
drop a gas tank on the side of the road.”  Thus, Bridges requested for a
canine unit to confirm his suspicions.  

          Bridges told the canine handler, Brian
Holley, that he knew there were drugs in the car but could not find any.  When the
drug dog approached the taillight area, he began to give positive alerts.  Holley
suggested that Bridges search the mounted spare tire on the back of the vehicle,
but they took the tire off and found nothing.  Bridges testified that, based on
the dog’s alerts, he felt he had probable cause to believe that narcotics were
hidden in the tank.

          Bridges told Montanez and Martinez that he had reason to believe their gas tank had been tampered with.  He informed
them that the dog had alerted on the vehicle and that they would have to follow
Bridges back to Nacogdoches so he could inspect the gas tank.  Bridges stated,
“You have to follow me.  If you go any other direction, you will be under
arrest.  You are under arrest right now.  You comprende?”  Montanez replied
that he understood.  According to Bridges, Montanez did not indicate in any way
at this point that he wanted to withdraw his consent to search.

          The entire roadside encounter lasted
about one and one-half hours.  At the task force headquarters in Nacogdoches, they removed the gas tank and found a hidden compartment containing seven
kilograms of cocaine.

Standard of Review

          According to the Court of Criminal
Appeals,

The issue is whether, after affording almost
total deference to the trial court’s determination of historical facts that are
supported by the record, the trial court abused its discretion by finding that
the State proved by clear and convincing evidence that Montanez voluntarily
consented to the search of the vehicle.

 

Montanez, 195 S.W.3d at 108.

Basis for Stop

          Montanez first contends that Bridges
did not have a lawful basis to stop him on the date in question.  Bridges
testified that he stopped Montanez because: (1) the cover around the edge of
the license plate obscured the name of the issuing state; and (2) the license
plate light was not working.

          The
latter stated basis for the stop constitutes a violation of section 547.322(f)
of the Transportation Code which provides:

[a] taillamp or a separate lamp shall be
constructed and mounted to emit a white light that:

 

                    (1) illuminates the rear
license plate; and

                    (2) makes the plate clearly
legible at a distance of 50 feet from the rear.

Tex. Transp. Code Ann. § 547.322(f) (Vernon 1999).[1]

          Bridges and Montanez’s counsel
disputed whether the videotape shows that the license plate lamp was
operational.  Bridges explained on re-direct examination that the license plate
is illuminated on the videotape by the headlights of his patrol car and by his
spotlight.  He reiterated that the license plate lamp “was not properly
working” when he stopped Montanez.  This is an issue on which we must give
“almost total deference” to the lower court’s decision.  See Montanez,
195 S.W.3d at 106 (quoting Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997)).

          Therefore, the court did not abuse its
discretion by finding that Bridges had a lawful basis for stopping Montanez.  See
Tex. Transp. Code Ann. § 543.001
(Vernon 1999); Atwater v. City of Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557, 149 L. Ed. 2d 549 (2001); State v. Gray, 158 S.W.3d 465,
469 (Tex. Crim. App. 2005).

Validity of Consent

          Montanez next contends that the court
abused its discretion by finding that he freely and voluntarily consented to
the search because the record shows that he does not understand the English
language very well.

          Bridges acknowledged in his testimony
that there was “somewhat of a language barrier” between Martinez and himself. 
On cross-examination, he agreed that Montanez had some limitations on his
ability to communicate in English.  However, Bridges testified, “I know that he
probably don’t speak as good English as I do,” but “in my opinion we
communicated quite well.”

          Martinez testified at the suppression
hearing with the aid of an interpreter.  In response to a question whether
Montanez understood English better than he, Martinez stated, “He was talking to
him a little bit more than me.”  Martinez conceded that he does not know how
much English Montanez knows.

          The videotape reflects that Bridges
repeated questions on several occasions when talking with Montanez.  Bridges
would occasionally use a familiar Spanish word or phrase but for the most part
spoke in English to Montanez.

          After reviewing the videotape and
listening to the testimony, the court would have been within its discretion to
conclude that Montanez only began to exhibit any indication that he did not
understand the English language when Bridges asked for consent to search.  The
videotape does not affirmatively establish that Montanez does not understand
the English language.  Because of the conflicting evidence on the issue, after
giving almost total deference to the trial court’s determination, we cannot say
the court abused its discretion by finding that the State proved by clear and
convincing evidence that Montanez voluntarily consented to the search of the
vehicle.  See Montanez, 195 S.W.3d at 108.

Scope of Consent

          Montanez finally contends that Bridges’s
decision to require him to drive to the task force’s headquarters to inspect
the gas tank and the search of the gas tank at that location exceeded the scope
of the consent given.

          Absent an officer’s request or a
suspect’s consent limiting a search to a particular area of a vehicle, such as
the trunk or passenger compartment, a request to search “the car” reasonably
includes all areas of the vehicle and excludes none.  When an officer
specifically asks a suspect if he can search a vehicle for illegal contraband,
and the suspect answers affirmatively, a reasonable person would construe the
consent to extend to any area of the vehicle in which such objects could be
concealed.

 

State v. Garrett, 177 S.W.3d 652, 657-58 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d) (citations omitted); accord Florida v. Jimeno,
500 U.S. 248, 251, 111 S. Ct. 1801, 1804, 114 L. Ed. 2d 297 (1991); Vargas
v. State, 18 S.W.3d 247, 253-54 (Tex. App.—Waco 2000, pet. ref’d); Cardenas
v. State, 857 S.W.2d 707, 711 (Tex. App.—Houston [14th Dist.] 1993, pet.
ref’d).

          Montanez placed no express limits on
the scope of his consent, and Bridges apparently did not expressly tell
Montanez that he wanted to search for narcotics.  Nevertheless, it is
objectively reasonable that an unlimited consent to search a vehicle will
extend to every part of the vehicle within which contraband may be hidden.  See
id.

          Thus, we cannot say that the court
abused its discretion by concluding that Bridges’s decision to require Montanez
to drive to the task force’s headquarters so the gas tank could be more closely
inspected and the search of the gas tank at that location did not exceed the
scope of the consent given.

Accordingly, we overrule Montanez’s sole issue
and affirm the judgment.

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(Justice
Vance dissenting)

Affirmed

Opinion delivered and
filed November 8, 2006

Publish

[CR25]

 

 









[1]
          Conversely, the “obstructed
license plate” allegation does not appear to have been a traffic violation
under the law in effect in 2000 when Montanez was arrested.  See Act of
May 30, 1999, 76th Leg., R.S., ch. 1189, § 17, 1999 Tex. Gen. Laws 4153, 4161
(amended 2003) (current version at Tex. Transp.
Code Ann. § 502.409 (Vernon Supp. 2006)); United States v.
Granado, 302 F.3d 421, 423-24 (5th Cir. 2002).








no Linotype"'>When the party that
had the burden of proof at trial complains of legal insufficiency of an adverse
finding, that party must demonstrate that the evidence establishes
conclusively, i.e., as a matter of law, all vital facts in support of
the finding sought.  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  We first examine the record for evidence supporting the adverse finding,
ignoring all evidence to the contrary.  Id.  If more than a scintilla of
evidence supports the adverse finding, our inquiry ends.  Id.  “More
than a scintilla of evidence exists where the evidence supporting the finding,
as a whole, rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.”  Burroughs Wellcome Co. v. Crye,
907 S.W.2d 497, 499 (Tex. 1995) (citations omitted).

When the party
complaining of the factual sufficiency of the evidence had the burden of proof
at trial, it must demonstrate that the adverse finding is contrary to the great
weight and preponderance of the evidence.  Francis, 46 S.W.3d at 242. 
We weigh all the evidence, and we can set aside the adverse finding only if it
is so against the great weight and preponderance of the evidence that it is
clearly wrong and unjust.  Id.  In doing so, we must detail the evidence
and state in what regard the contrary evidence greatly outweighs the evidence
in support of the adverse finding.  Id.





[4]               Based on the total
monetary amount that Smith seeks in the appeal and the additional offsets that
we have found he is entitled to, we find that Colonial Group is the prevailing
party in this appeal.





[5]               We calculate prejudgment
interest under section 304.104 of the Texas Finance Code and award prejudgment
interest from the date suit was filed (July 8, 2003) to the date of our
judgment (October 25, 2006).  See Tex.
Fin. Code Ann. § 304.104 (Vernon 2006).  The current judgment interest
rate is 8.25%.  (See http://www.occc.state.tx.us/pages/int_rates/Index.html)
(last visited Oct. 17, 2006).  Prejudgment interest is calculated by the formula P x R x
T = I, where P is the amount of actual damages ($7,076.77), R is the interest rate (.0825), T is the
time (1,205 days divided by 365 days = 3.3013 years), and I ($1,927.41)
is the prejudgment interest award.  See Texas Farmers Ins. Co. v.
Cameron, 24 S.W.3d 386, 400 & n.5 (Tex. App.—Dallas 2000, pet. denied).

 





[6]               Judge of the 35th District
Court of Brown and Mills Counties, sitting by assignment of the Chief Justice
of the Texas Supreme Court pursuant to section 74.003(h) of the Government
Code.  See Tex. Gov't Code Ann.
§ 74.003(h) (Vernon 2005).